UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------x

WANTAGH UNION FREE SCHOOL DISTRICT, WANTAGH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, WYANDANCH UNION FREE SCHOOL DISTRICT, WYANDANCH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, ANTHONY GRECO, *in his capacity as a Wantagh Board of Education Member and a Resident of the School Community*, and CHARLIE REED, *in his capacity as a Wyandanch Board of Education Member and a Resident of the School Community*.

Index No. _____

**VERIFIED COMPLAINT AND PETITION**

Plaintiffs-Petitioners,

-against-

NEW YORK STATE BOARD OF REGENTS, LESTER W. YOUNG, JR, in his official capacity as Chancellor of the New York State Board of Regents, JOSEPHINE VICTORIA FINN, in her official capacity as Vice Chancellor of the New York State Board of Regents, ROGER TILLES, in his official capacity as a member of the New York State Board of Regents, CHRISTINE D. CEA, in her official capacity as a member of the New York State Board of Regents, WADE S. NORWOOD, in his official capacity as a member of the New York State Board of Regents, KATHLEEN M. CASHIN, in her official capacity as a member of the New York State Board of Regents, JAMES E. COTRELL, in his official capacity as a member of the New York State Board of Regents, JUDITH CHIN, in her official capacity as a member of the New York State Board of Regents, CATHERINE COLLINS, in her official capacity as a member of the New York State Board of Regents, ELIZABETH S. HAKANSON, in her official capacity as a member of the New York State Board of Regents, LUIS O. REYES, in his official capacity as a member of the New York State Board of Regents, SUSAN W. MITTLER, in her official capacity as a member of the New York State Board of Regents, FRANCES G. WILLS, in her official capacity as a member of the New York

1

State Board of Regents, ARAMINA VEGA FERRER, in her official capacity as a member of the New York State Board of Regents, SHINO TANIKAWA, in her official capacity as a member of the New York State Board of Regents, ROGER P. CATANIA, in his official capacity as a member of the New York State Board of Regents, ADRIAN I. HALE, in his official capacity as a member of the New York State Board of Regents.

Defendants-Respondents.

--------------------------------------------------------------------------x

Plaintiffs-Petitioners WANTAGH UNION FREE SCHOOL DISTRICT, WANTAGH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, WYANDANCH UNION FREE SCHOOL DISTRICT, WYANDANCH UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION, ANTHONY GRECO, and CHARLIE REED, as and for their Verified Complaint and Petition, state and allege the following as against Respondent NEW YORK STATE BOARD OF REGENTS and Defendants-Respondents LESTER W. YONG, JR., in his official capacity as Chancellor of the New York State Board of Regents, JOSEPHINE VICTORIA FINN, in her official capacity as Vice Chancellor of the New York State Board of Regents, ROGER TILLES, in his official capacity as a member of the New York State Board of Regents, CHRISTINE D. CEA, in her official capacity as a member of the New York State Board of Regents, WADE S. NORWOOD, in his official capacity as a member of the New York State Board of Regents, KATHLEEN M. CASHIN, in her official capacity as a member of the New York State Board of Regents, JAMES E. COTRELL, in his official capacity as a member of the New York State Board of Regents, JUDITH CHIN, in her official capacity as a member of the New York State Board of Regents, CATHERINE COLLINS, in her official capacity as a member of the New York State Board of Regents, ELIZABETH S. HAKANSON, in her official capacity as a member of the New York State Board of Regents, LUIS O. REYES, in his official capacity as a member of the New

York State Board of Regents, SUSAN W. MITTLER, in her official capacity as a member of the New York State Board of Regents, FRANCES G. WILLS, in her official capacity as a member of the New York State Board of Regents, ARAMINA VEGA FERRER, in her official capacity as a member of the New York State Board of Regents, SHINO TANIKAWA, in her official capacity as a member of the New York State Board of Regents, ROGER P. CATANIA, in his official capacity as a member of the New York State Board of Regents, ADRIAN I. HALE, in his official capacity as a member of the New York State Board of Regents:

## PRELIMINARY STATEMENT

1.    This is a hybrid Article 78 proceeding and declaratory judgment action seeking to annul *Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools* (hereinafter "Part 123") and enjoin its enforcement.

2.    In their declaratory judgment action, Plaintiffs-Petitioners challenge the constitutionality of Part 123 and seek prospective and injunctive relief against Defendants-Respondents.

3.    In their Article 78 proceeding, Plaintiff-Petitioners seek a judgment declaring Part 123 is arbitrary and capricious and an abuse of discretion in that it was enacted in violation of law and outside the scope of Defendants-Respondents' authority.

4.    Despite the fact that Part 123 was not lawfully enacted, is arbitrary and capricious, and raises constitutional issues, Plaintiffs-Petitioners still plan to change their respective mascots and/or logos to remove any Native American-associated imagery. However, they seek equitable relief that will allow them to maintain the name "Warriors."

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 3613. This Court has supplemental jurisdiction over the New York State law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY TRIAL DEMAND

7.      Plaintiffs demand a trial by jury.

## PARTIES

8.      Plaintiff-Petitioner Wantagh Union Free School District ("Wantagh UFSD") is a pre-K-12 public school district located in Wantagh, New York that currently serves approximately 2,832 students in five schools: Wantagh Elementary, Mandalay Elementary, Forest Lake Elementary, Wantagh Middle School, and Wantagh High School. Wantagh UFSD administrative offices are located at 3301 Beltagh Avenue, Wantagh, New York 11793.

9.      Plaintiff-Petitioner Wantagh Union Free School District Board of Education ("Wantagh Board") is the duly elected governing body of Wantagh UFSD. The Wantagh Board is comprised of five residents of the community who serve staggered three-year terms as representatives in all matters concerning the school district.

10.     Plaintiff-Petitioner Wyandanch Union Free School District ("Wyandanch UFSD") is a Pre-K-12 public school district located in Wyandanch, New York that currently serves approximately 2,788 students in four schools: LaFrancis Hardiman School, Martin L. King Jr. Elementary School, Milton L. Olive Middle School, and Wyandanch Memorial High School. The Wyandanch UFSD's administrative offices are located at 1445 Dr. Martin Luther King Jr. Blvd., Wyandanch, New York 11798.

11.     Plaintiff-Petitioner Wyandanch Union Free School District Board of Education ("Wyandanch Board") is the duly elected governing body of Wyandanch UFSD. The Wyandanch Board is comprised of seven residents of the community who serve staggered two and three-year terms as representatives in all matters concerning the school district.

12.     Plaintiff-Petitioner Anthony Greco is a member of the Wantagh Board of Education and a resident of the Wantagh School District with several relatives who are current District students.

13.     Plaintiff-Petitioner Charlie Reed is a member of the Wyandanch Board of Education and a resident of the Wyandanch School District with relatives who are current District students.

14.     Respondent New York State Board of Regents ("Board of Regents") sets education policy for the State of New York and oversees both the University of the State of New York and New York State Education Department (hereinafter "NYSED"). Plaintiffs-Petitioners pursue only an Article 78 petition as against the Board of Regents.

15.     Plaintiffs-Petitioners pursue an Article 78 petition and plenary action against the remaining Defendants-Respondents.

16.     Defendant-Respondent Lester W. Young, Jr. ("Chancellor Young") is the duly appointed Chancellor of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

17.     Defendant-Respondent Josephine Victoria Finn ("Vice Chancellor Finn") is the duly appointed Vice Chancellor of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting

education policy for New York State, including those complained of herein.

18.     Defendant-Respondent Roger Tilles is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

19.     Defendant-Respondent Christine D. Cea is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

20.     Defendant-Respondent Wade S. Norwood is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

21.     Defendant-Respondent Kathleen M. Cashin is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

22.     Defendant-Respondent James E. Cotrell is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

23.     Defendant-Respondent Judith Chin is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which

is charged with recommending and setting education policy for New York State, including those complained of herein.

24.     Defendant-Respondent Catherine Collins is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

25.     Defendant-Respondent Elizabeth S. Hakanson is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

26.     Defendant-Respondent Luis O. Reyes is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

27.     Defendant-Respondent Susan W. Mittler is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

28.     Defendant-Respondent Frances G. Wills is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

29.     Defendant-Respondent Aramina Vega Ferrer is a duly appointed member of the

Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

30.    Defendant-Respondent Shino Tanikawa is a duly appointed member of the Board of Regents. She is sued in her official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

31.    Defendant-Respondent Roger P. Catania is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

32.    Defendant-Respondent Adrian I. Hale is a duly appointed member of the Board of Regents. He is sued in his official capacity and in that capacity sits on the Board of Regents which is charged with recommending and setting education policy for New York State, including those complained of herein.

## LEGAL FRAMEWORK

33.    For school districts located in the State of New York, the determination as to whether to conduct an interscholastic sports program lies within the authority and discretion of the board of education, as does the manner in which any such program is to be conducted. *See Appeal of Tobin*, 25 Ed. Dept. Rep. 301 (Decision No. 11,591).

34.    Additionally, a board of education has discretion to how to conduct an interscholastic sports program, which includes determining "the propriety of a sports team name, mascot, or logo. *Id.* Such decisions "will be set aside only upon a showing that the Board has

abused its discretion." *Id.*

**FACTS AND PROCEDURAL HISTORY**
**UNDERLYING THIS PROCEEDING**

**A. The Names of Many Municipalities, Bodies of Water, and Other Cherished Landmarks Throughout the State of New York Derive From Native American Culture**

35.     Long Island's rich history originates from the Native American tribes who once lived in the area. And these historical roots live on in the names of municipalities, school districts, public parks, bodies of water, and various historical landmarks, which are derived from the names of local tribes, famous Native Americans, and Algonquin phrases.

36.     According to reports from early settlers, there were 13 tribes of the Algonquin Family, now known as the "13 Tribes of Long Island," at the time of European settlement. According to early accounts from European settlers, these tribes included the Canarsie, Rockaways, Merricks, Massapequas, Matinecocks, Nissaquogues, Setaukets, Corchaugs, Secatogues, Unkechaugs, Shinnecock, Montaukett, and Manhansets.

37.     Several of these tribe names may look familiar as they inspired the names of municipalities throughout Long Island, including the Rockaways, Merrick, Massapequa, Setauket, Shinnecock, Montauk, Amagansett, and Manhasset.

38.     Other examples of municipal names derived from Native American language and people include Wyandanch, Patchogue, Mattituck, Ronkonkoma, Quogue, Yaphank, Cutchogue, Copiague, Commack, Nyack, Mecox, Noyac, Moriches, Sagaponack, Tuckahoe, Ponquogue, etc.

39.     Even the name Manhattan is of Native American Lenape origin. It comes from the Lenape word "Manhatta," which has been translated to "the place where bows are from" or "hilly island."

40.     These Native American historical roots extend far beyond Long Island. In fact, the

names of counties all over the State of New York originate from Native American tribes, people, and phrases. For instance, Allegany County derives its name from a Lenape word. Cayuga County was named after the Cayuga tribe of Native Americans. Other examples of county names derived from Native American tribes or phrases include, but are not limited to, the Counties of Chautauqua, Chemung, Oneida, Onondaga, Oswego, Otsego, Saratoga, Seneca, and Tioga.

41.     There are also various bodies of water named after Native American tribes or phrases including the Ashokan Reservoir, Seneca Lake, Cayuga Lake, and Lake Ronkonkoma.

**B. The Villages of Wantagh and Wyandanch and Their School Districts Were Named After Famous Native American Sachems**

42.     Wantagh is a hamlet of Nassau County located in the Town of Hempstead. The Wantagh UFSD is located in the Incorporated Village of Wantagh.

43.     Wantagh's name and history—like many other municipalities throughout the State of New York, come from Native American roots. In fact, it was named after a real person: Chief Wantagh.

44.     The area now known as Wantagh was occupied by Native American tribes for thousands of years. Before the European settlement of the area, which occurred in the 17th century, it was occupied by the Merokee Native Americans, an Algonquin tribe indigenous to the area.

45.     According to local historical experts, in 1644 a group of Englishman crossed the Long Island Sound from Connecticut to relocate their families to the Hempstead area. Two of these Englishmen, Captain John Seaman and Robert Jackson, settled in the present area of Wantagh and Seaford. They purchased the land (which amounted to 6,000 acres) from the Native Americans who inhabited the area at that time. The first land sale agreement was signed in 1644 by Tackapausha, who was the Chief of the Marsepeque tribe and responsible for that area at the time.

46.     On July 4, 1657, a more formal agreement was signed by the Governor of

Manhattan and Chief Wantagh who, at the time, was the Grand Sachem of the Montauks. This agreement was meant to settle any disputes resulting from the original land purchase. From that point onward, early Dutch and English settlers coexisted peacefully with native tribes in the area.

47.     In 1666, the area was named "Jerusalem," a name inspired by Quakers who had settled and farmed the land.  It was renamed Ridgewood sometime in the 1880s.

48.     As Ridgewood grew in size, the community applied to have a post office in the area. The U.S. Post office, however, refused to approve the application because the name Ridgewood was already claimed by another community. The application would only be approved after a name change.

49.     After deciding the name "Ridgewood" had to go, members of the Congressional Church hosted a contest in 1891 to rename the village. The Society for Village Improvement proposed several names, but the villagers preferred the name "Wantagh."

50.     The village was officially renamed "Wantagh" to honor the former Grand Sachem who was instrumental in bringing peace to the area 250 years earlier.

51.     And instrumental in this 1891 name change was Thomas Seaman, a descendant of John Seaman who was a signatory to the 1657 Agreement also signed by Chief Wantagh.

52.     The Wantagh UFSD, like the municipality in which it lies, also honors Chief Wantagh in name.

53.     The first schoolhouse in Wantagh dates back to the 1800's, as does the school district's Board of Education. As the population of Wantagh grew over the years, particularly after World War II, so too did the size of its school district. Wantagh Elementary School was built in 1950. Wantagh High School first opened its doors to students in September of 1954, and graduated its first senior class in June of 1956. And Wantagh Middle School was completed in 1965.

54. The "Wantagh Warriors" name and logo, which depicts the profile of a Native American in full headdress, dates back to 1956. Depicted below is the current imagery of the school's logo for Wantagh High School and Wantagh Middle School.[1] As depicted below, this logo is affiliated with the school district's core principles: Vision, Tradition, Pride, and Excellence.[2]



55. The high school's student-run online news site is named "The Warrior." While this student club bears the same name, its website banner and logo (depicted below) do not include any Native American imagery.



56. At school sports events and other functions, you can find members of the school community sporting "Warriors" apparel, which can be found in Wantagh High School's Apparel Store.

57. Senator Steven Rhoads explained it best in a June 14, 2023 letter to Commissioner

---

[1] The current mascots of the district's three elementary schools are Buzz the Bee, Forester the Bear, and Bubbles the Dolphin. These three mascots are not impacted by Part 123.
[2] These images are located on the Wantagh UFSD's website, which can be accessed at https://www.wantaghschools.org/. The images to the left can also be found on the Wantagh Warriors Athletics website, which can be accessed at https://wantaghwarriorathletics.org/.

Betty Rosa: "The Choice of the Wantagh Warriors name, logo, and mascot is clearly appropriate and consistent with his community's ongoing effort to honor its history and pay tribute to the tribal leader whose contributions made the peaceful development of the area possible." (A copy of Senator Rhoads' June 14, 2013 letter is attached as Exhibit A.)

58.     Wyandanch is a hamlet of Suffolk County located in the Town of Babylon. Wyandanch UFSD is located in the Village of Wyandanch.

59.     As with Wantagh, and many other municipalities throughout the State of New York, Wyandanch's name and history comes from Native American roots. The area now known as Wyandanch was inhabited by the Massapequa Indians until 1706 when Jacob Conklin purchased the land.

60.     The village was named after a real person: Chief (or Sachem) Wyandanch who was a famous sachem in the 17th century.

61.     The first Wyandanch Public School opened in 1937, and additional school facilities were built as a result of the 1950s population boom.

62.     The villages of Wantagh and Wyandanch, and their respective school districts, were named to honor famous sachems.

**C. Plaintiffs-Petitioners Have Committed to Retiring their Native American Imagery and Only Seek to Maintain the "Warrior" Name Which is A Universal Cultural Symbol, Not Only a Native American One**

63.     As Brian Polite, the Chairman of the Shinnecock Indian Nation, publicly acknowledged, the name Warrior is not exclusive to native culture as there are many cultures who have warriors.

64.     This is true. Various cultures throughout history have honored the great warriors of their time.

65.     The name Warrior dates all the way back to the greatly feared Celtic warriors who lived in Celtic Europe, a culture that is believed to have started to evolve as early as 1200 B.C., which was the Iron Age.

66.     Fast forward through history, and you have the great warriors of Ancient Rome and Greece, such as the Trojan Warriors and Spartan warriors who came from a warrior society in ancient Greece. Ancient Greek warriors, like Achilles, Hercules, Odysseus, and Perseus, are well-known throughout the world, and have inspired countless movies and tv shows, like Xena: The Warrior Princess.

67.     The Warrior name can be found in various other parts of human history, such as medieval knights who served as warriors during the Middle Ages, Scottish Warriors, the Mongol Warriors of East Asia, Viking Warriors (also known as sea warriors), Ottoman Mamluk Warriors, Samurai Warriors (the warriors of premodern Japan), Jewish rebel warriors also referred to as the Maccabees, and the Valkyrie warriors (a figure in Norse Mythology depicted as a warrior woman).

68.     The Warrior name is also used by various schools and institutions of higher education, not only throughout the State of New York, but throughout the Country.

69.     At the collegiate level, several colleges use the Warrior name including Westmont College, Wayne State University, Bacone College, Sterling College, Merrimack College, Lycoming College, Eastern Connecticut State University, East Stroudsburg University of Pennsylvania, and Wisconsin Lutheran College.

70.     With the removal of any Native American imagery and a successful rebrand, the Warriors name would not fall within the definition of "Indigenous name, logo, or mascot" as set forth in Part 123. (8 NYCRR 123.1.)

71.     In fact, the NYSED has permitted school districts to continue to use the Warriors

name if it was never associated with Native American culture. This is proof that the Warriors name with no Native American imagery is not prohibited by Part 123.

72.     While the NYSED has attempted to expand this definition through after-the-fact statements to prohibit any name, logo, or mascot that bore any connection to Native American culture at any point in time, Part 123 said no such thing. Defendants-Respondents cannot unilaterally expand the scope of its regulation after its enactment.

**D.  New York State's Dignity for All Students Act**

73.     In September 2010, the New York State Legislature enacted the Dignity for All Students Act (hereinafter "DASA") which took effect in July 2012. New York's Education Law was amended to create a new Article 2 entitled "Dignity for All Students."

74.     DASA prohibits bullying harassment, discrimination, and cyberbullying against students in school or at school functions based on their actual or perceived membership in a protected class. *See* N.Y. Educ. Law § 12.

75.     The legislation was designed to prevent incidents of discrimination or harassment, including bullying, taunting, or intimidation, through the institution of preventive, educational measures.  *See* N.Y. Educ. Law § 10; *see also* New York Bill Jacket, 2010 A.B. 3661, Ch. 482.

76.     Prior to the enactment of DASA, New York was one of only eight states without anti-bullying legislation.

77.     As reflected in the legislative history of the act, the State Legislature felt it important to create state-wide anti-bullying legislation to combat bullying and harassment in schools. The Bill Jacket for DASA provides, "Although school yard bullies have long had a presence on public school grounds, this bill will help ensure that school administrators and educators have the tools and resources in place to afford all students – and particularly those who

are targeted by such bullies – an educational environment in which they can thrive." *See* New York Bill Jacket, 2010 A.B. 3661, Ch. 482.

78.     This sentiment was reiterated in a Senator's July 16, 2010 letter to then-Governor Patterson (which is also part of the Bill Jacket): "[t]he implementation of DASA will provide clear direction to school districts and reduce the incidents of harassment and discrimination which are now an epidemic in our schools." *Id.*

**E. Part 123 of the Regulations of the Commissioner of Education**

79.     This lawsuit challenges the enactment of *Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools*" (hereinafter "Part 123"), 8 NYCRR 123.1 *et seq.*

80.     Part 123 prohibits public schools in the State of New York from utilizing or displaying any Indigenous name, logo, or mascot other than for purposes of classroom instruction. (8 NYCRR 123.2.)

81.     Part 123 defines "*Indigenous name, logo, or mascot*" as "a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such school sports teams." (8 NYCRR 123.1.) This definition excludes a public school, school building, or school district named after an Indigenous tribe. (*Id.*)

82.     Part 123 provides for certain exceptions to this rule. First, a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation is not prohibited from choosing to use an Indigenous name, logo, or mascot for a sports team comprised of its tribal members, including an Indigenous name, logo, or mascot for a sports team comprised

of its tribal members, including a tribal school or intramural league. (8 NYCRR 123.4(a).)

83.     Second, Part 123 does not apply where a written agreement exists between a federally recognized tribal nation within the State of New York or a New York State recognized tribal nation and a public school permitting the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe. (8 NYCRR 123.4(b).)

84.     Under this provision of Part 123, the NYSED will only acknowledge written agreements submitted before May 3, 2023, and will therefore reject any written agreements submitted after that date. Part 123 does not provide for any extensions of this deadline.

85.     Part 123 also requires public schools to prohibit school officers and employees from utilizing or promoting any Indigenous name, logo, or mascot, while on school property or at a school function, except for school officers or employees who are a member of a tribal nation and are utilizing or promoting an Indigenous name logo, or mascot of such tribal nation. (8 NYCRR 123.5.)

86.     Part 123 required boards of education to commit, via resolution, to eliminating the use of all Indigenous names, logos, and mascots by the end of the 2022-2023 school year. (8 NYCRR 123.3(a).) And it requires those resolutions to identify a plan to eliminate all use of the prohibited name, logo, or mascot by the end of the 2024-2025 school year. (*Id.*) Part 123 allows the commissioner to grant an extension of these timelines "[u]pon a showing of good cause." (8 NYCRR 123.3(b).)

87.     Because the NYSED will not provide any funding to support its mandate, school districts are also forced to figure out how to fund this large undertaking.

**F.  History of Implementation of Part 123 of the Regulations of the Commissioner of Education**

88.     In April of 2001, Richard Mills (the Commissioner of Education at the time)

released a memorandum to all public school districts in the State of New York outlining his position on public schools' use of Native American names, symbols, and mascots and asking boards of education to end the use of Native American mascots as soon as possible.

89.     The NYSED did not issue any Commissioner's regulations or mandatory guidelines to this effect after the Commissioner of Education released his April 2001 memorandum.

90.     While a bill seeking to amend the Education Law to prohibit public schools from using a native name, logo, or mascot was presented to the State Assembly during its 2021-2022 Legislative Session, it was referred to the Assembly Committee on Education and remains there for review. To this day, the State Legislature has never enacted a law to this effect.

91.     Twenty-one years after the April 2001 memorandum was released, James Baldwin, the Senior Deputy Commissioner for Education Policy at the NYS Education Department, released a memorandum on November 17, 2022 in which he declared that public school districts were prohibited from using Native American mascots and threatened removal of school officers and withholding of State Aid if school districts did not affirmatively commit to replacing its Native American team name, logo, and/or imagery by the end of the 2022-2023 school year.

92.     This November 17, 2022 memorandum referenced regulations that were being developed by the NYSED, couching them as regulations that would clarify school districts' obligations.

93.     Mr. Baldwin made this across-the-board directive to all public school districts before Part 123 was even drafted, much less subjected to a 60-day public comment period or actually promulgated in accordance with the State Administrative Procedure Act (hereinafter "SAPA").

94.     The State created a statutory scheme for administrative agencies to promulgate

rules and regulations, and this November 17th memorandum was a blatant departure from those requirements. Neither Mr. Baldwin, nor the Commissioner of Education herself, has the authority to adopt an across-the-board directive without first formally adopting a regulation or rule to that effect.

95.    On December 1, 2022, the Board of Regents indicated they anticipated the proposed amendment would be presented for permanent adoption at the April 2023 Regents meeting, and become effective as a permanent rule on May 3, 2023, after publication of the proposed amendment in the State Registrar and expiration of the 60-day public comment period required under SAPA.

96.    Accordingly, even prior to the public comment period, the NYSED made it clear it planned to adopt Part 123 before the public comment period even began. To make matters worse, the November 17th memorandum made it clear the NYSED planned to adopt Part 123 before it even finished preparing a draft of it. In other words, the NYSED's compliance with SAPA was mere window dressing, as the NYSED was just going through the motions before reaching a conclusion that was already pre-ordained. This is further evidenced in the NYSED's *Assessment of Public Comment*, which was released in April 20223. There, the NYSED acknowledged it provided school districts with advance notice of its intentions in Mr. Baldwin's November 7, 2022 memorandum. Again, the NYSED declared its intentions to enact a regulation that was still in the works and had not undergone the requisite "notice-and-comment" requirements of SAPA.

97.    On December 28, 2022, the NYSED released a draft of Part 123, which triggered the beginning of the 60-day public comment period.

98.    After publishing the proposed amendment in the State Register, the NYSED received various comments during the 60-day public comment period; some were supportive of

the proposed changes and others were strongly opposed to it.

99.    After the public comment period, the NYSED made two revisions to the proposed amendment, which they characterized as non-substantial.

100.    On April 18, 2023, the Board of Regents voted to adopt Part 123 which took effect on May 3, 2023.

101.    Part 123 set a June 30, 2023 deadline for boards of education to first self-determine if their names, logos, or mascots even fall within the scope of Part 123, and if so, to commit, via resolution to eliminate such names, logos, and mascots by the end of the 2022-2023 school year.

**G.  The Wantagh UFSD's Response to Part 123**

102.    Upon reviewing Part 123, the Wantagh Board of Education decided it would retire the district's current imagery but fight to keep the "Warrior" name.

103.    On June 1, 2023, the Wantagh UFSD submitted a plan to NYSED entitled "*Wantagh Union Free School District NYSED Indigenous Mascot Regulation Board of Education Plan*" (hereinafter the "June 1 Wantagh Replacement Plan.") (A copy of this June 1 Wantagh Replacement Plan is attached as Exhibit B.)

104.    In its June 1 Wantagh Replacement Plan, the Wantagh Board of Education acknowledged the Wantagh USFD's current imagery being used by the school district was implicated by Part 123 and represented it would retire that imagery and rebrand the Warrior name. (Ex. B at p. 2.)

105.    Although the Wantagh Board of Education concluded its current imagery was clearly implicated by Part 123, it took did not reach that conclusion with respect to the "Warrior name." On the contrary, the Wantagh Board of Education, in relying on Part 123's definition for Indigenous name, logo, or mascot, reached the exact opposition conclusion: that it was "equally

clear that the Warrior name would not fit into the definition, as it is not a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, customs, symbols, or traditions." (*Id.*)

106.    The June 1 Wantagh Replacement Plan referred to Mr. Polite's public statement that he has no opposition to the Warrior name so long as there is no Native American imagery that goes along with it. (*Id.* at p. 3.)

107.    NYSED Assistant Commissioner David Frank denied the Wantagh Board of Education's request to keep the Warrior name.

108.    On June 14, 2023, Senator Rhoads, a Wantagh resident and representative of the 5th Senatorial District, sent a comprehensive letter to Commissioner Rosa urging the NYSED to reconsider its decision concerning the Wantagh Warriors, and its decision to enact Part 123 in general.

109.    Senator Rhoads opined that the mere enactment of Part 123 was unlawful and an abuse of discretion. He wrote:

> The broad purpose of the Dignity for All Students Act, (DASA), to create an environment "*free from discrimination, intimidation. Taunting harassment. and bullying on school property, a school bus and/or at a school function,"* is certainly a laudable goal. The decision, however, by the Board of Regents and you, as Commissioner, to institute a blanket statewide ban on the use of indigenous names, logos and mascots without an assessment on a case by case basis whether the use of such items in any way actually promotes a culture of *"discrimination, intimidation. taunting. harassment. and bullying"* is, respectfully, an abuse of discretion and an overbroad interpretation of the statute, unintended by the Legislature.

(Ex. A at p. 1.)

110.    In addition not being an abuse of discretion, Senator Rhoads also criticized the manner in which Part 123 was drafted, calling it "poor policy" His letter June 14 letter continues:

> The State Education Department's state-wide and universal ban on the use of indigenous names, logos and mascots under the pretext of DASA's charge to

create an environment *"free from discrimination. intimidation, taunting. harassment and bullying"* while making absolutely no effort to consider whether the use of such name, logo or mascot, given the history and circumstances of its use, actually creates such an environment, is not only poor policy, but creates a dangerous precedent, particularly in an educational setting…

I also urge that the SEO create a mechanism for the individual evaluation of continued use of certain names, logos and mascots based upon community history, purpose and whether its continued use will create an environment which DASA was actually intended to avoid.

(*Id.* at pp. 2-3.)

111.    After receiving this denial, the Wantagh Board of Education revised its Replacement Plan on June 15, 2023 to incorporate the fact that its request to keep the Warrior's name was denied. (A copy of the June 15 Board Replacement Plan is attached as Exhibit C.)

112.    In this June 15 Board Replacement Plan, the Wantagh Board of Education reiterated that it remained committed to retiring the imagery associated with the current district logo but would still like to keep the Warrior name and rebrand it. (Ex. C at p. 2.) The Wantagh Board of Education prepared this plan for the sole purpose of complying with Part 123, which threatened removal of school officers and withholding of State Aid if school districts did not comply with the June 30, 2023 deadline.

113.    In order to comply with the June 30, 2023 deadline imposed by Part 123, the Wantagh Board of Education also passed a resolution with a plan to eliminate the use of prohibited Indigenous names, mascots, and logos by the end of the 2024-2025 school year. The resolution makes clear, however, that the Wantagh Board of Education's compliance shall in no way serve as a waiver or be construed as a waiver of the District's right to, among other things, challenge (a) whether the use of the "Warrior' name does in fact constitute a prohibited "indigenous name, logo or mascot" pursuant to Part 123, and (b) whether Part 123 should be repealed and/or determined

to be unenforceable by the Commissioner and/or of any court of competent jurisdiction.

114.     The Wantagh Board of Education also indicated in its resolution that should Part 123 be repealed and/or determined to be unenforceable, it will immediately reinstate the "Warrior" team name and authority its usage in a manner unconnected with any indigenous imagery.

115.     This forced resolution was passed by the Wantagh Board on June 15, 2023. This action now follows.

116.     On June 28, 2023, the Wantagh UFSD surveyed the community to gather feedback about the requirement for school districts to move away from Indigenous mascots. This survey data was collected over a two-week period from June 28 through July 11, 2023. The survey yielded 962 responses, which the Wantagh Board considered when deciding how to move forward.

117.     Of the 962 community members who participated in the survey, 54.8% indicated the district should maintain the current imagery and "Warriors" name, 33.9% indicated the district should remove the imagery and maintain the "Warriors" name, and only 11.3% said the district should remove both and develop a new nickname and imagery. Additionally, 73.7% of the community members who were surveyed indicated the district should file a lawsuit against the State to keep the "Warriors" name. The survey also asked for the community's input on how much the District should spend on legal fees to pursue the matter. The results were a mix bag in terms of the amount that should be spent, but the majority felt the district should spend some money on legal fees and 30.8% supported the district spending over $100,000 to challenge the regulation. (A copy of the Wantagh UFSD Board of Education Mascot Survey Results, dated July 12, 2023, are attached as Exhibit D.)

**H.  The Wyandanch UFSD's Response to Part 123**

118.     After Senior Deputy Commissioner Baldwin issued his November 17, 2022

memorandum ordering all school districts to stop using "Indian" mascots and associated Native American imagery—which was five months before Part 123 was even proposed, let alone enacted—the Wyandanch UFSD commenced discussions with Native American tribal leaders from the National, State, and local levels to discuss the possibility of retiring all Native American imagery and only keeping the "Warriors" name. These meetings signified the district's commitment and willingness to work together and be compliant.

119.    The Wyandanch UFSD's conversations with the Shinnecock Indian Nation were ongoing. They began as early as December 2022, and continued in March 2023, and again during the first week of May 2023.

120.    After reaching an agreement with the Shinnecock Indian Nation, the Wyandanch UFSD promptly reached out to the NYSED to procure an exemption to keep the Warriors name, but the NYSED denied the request via email saying, "It is too late" because the deadline to secure an exemption was May 3.

121.    As Newsday reported in a May 11, 2023 online article, Chairman of the Shinnecock Indian Nation, Mr. Polite, stated publicly on May 10, 2023 that he would have been in favor of allowing Wyandanch UFSD to keep its Warriors team name so long as it removes any Native American imagery. Mr. Polite also went on record to say that Wyandanch was the only district to reach out to him and that he personally did not see an issue with Wyandanch keeping the Warriors name only. He was further quoted in the Newsday article as giving the following response to Wyandanch's proposed to keep the Warriors name only: "This is kind of a no-brainer. Unless there's Native American imagery that goes along with it, the name Warrior isn't exclusive to native culture. There are many cultures who have warriors, and I don't have any issue with them using it

so long as there's no Native American imagery that goes along with that."[3]

122.    In other words, the NYSED is requiring the Wyandanch UFSD to change its Warriors name simply because it qualified for an exemption eight days late.

123.    It is nonsensical that an arbitrary May 3, 2023 deadline is the only distinguishing factor between a permissible use of the Warriors name and an impermissible one—especially when school districts have until the end of the 2024-2025 school year to comply with Part 123.

124.    In order to comply with the June 30, 2023 deadline imposed by Part 123, the Wyandanch District Board of Education passed a resolution with a plan to eliminate the use of prohibited Indigenous names, mascots, and logos by the end of the 2023-2024 school year. The resolution makes clear, however, that the Wyandanch Board of Education reserves its right to (a) challenge Part 123 pursuant to applicable law, and (2) communicate with the NYSED and local politicians to demonstrate the name "Warrior" should not be prohibited when it is disassociated from indigenous imagery.

125.    This forced resolution was passed by the Wyandanch Board of Education on June 21, 2023. This action now follows.

126.    That same day (June 21, 2023), the Wyandanch UFSD released a Rebranding Action Plan outlining a timeline for compliance with Part 123.  The Wyandanch Board of Education prepared this plan in accordance with Part 123's June 30, 2023 deadline to do so.

**I.    Part 123 Contains Vague Language, Which Makes It Difficult for School Districts to Navigate A Regulation That Is Designed to Be Self-Policing**

127.    Part 123 is a self-policing regulation; the NYSED has left it up to boards of

---

[3] This May 11, 2023 Newsday article, entitled "Shinnecock Nation open to Wyandanch keeping Warriors name, but state says it's too late for exemptions," is publicly available at https://www.newsday.com/sports/high-school/native-american-mascot-ban-wyandanch-shinnecock-nation-wk7khjov.

education to determine whether their team names, logos, or mascots are prohibited by Part 123—which appears to prohibit any name or item that is, or was at any point in time, loosely tied to indigenous people. In other words, it is up to the school district to decide where the Board of Regents drew its proverbial line.

128.     However, Part 123 fails to include any standards or criteria for school districts to determine the meaning, scope, and application of the regulation and its prohibition against the use of names, logos, and mascots by public schools.

129.     Part 123 does not adequately define what constitutes an Indigenous custom, symbol, or tradition.

130.     Part 123 also fails to describe the difference between a stereotypical aspect of Indigenous culture, as opposed to a representation that is accurate and respectful.

131.     Persons of common intelligence must necessarily guess at the meaning, scope, and application of Part 123.

132.     Additionally, the Board of Regents and NYSED never issued a list of schools that it considered to violate the new regulation. Nor has the State been very forthcoming in responding to inquiries about the scope of the regulation.

133.     There is no evidence the Board of Regents conducted any review, much less an extensive one, of New York public school logos to see if they might refer to a Native American tribe or individual. Rather, the Board of Regents issued a sweeping regulation prohibiting any non-exempt use of an Indigenous name, logo, or image, without taking their origin into account.

134.     As set forth above, school districts are exempted from Part 123 where an agreement exists between a federally or state-recognized Indian tribe and a public school. (8 NYCRR 123.4(b).)

135.     The exception to Part 123 allowing public schools to use Indigenous names, logos, or imagery that would overwise violate the regulation absent the existence of an agreement between a federally or state-recognized Native American tribe and public school, is also problematic.

136.     It is not appropriate to condition a school district's use of an honorific Native American name or symbol based on a school's ability to locate, negotiate, and contract with a federal or state-recognized tribe that may or may not represent the actual interests of the school's Native American constituents.

137.     For instance, under Part 123 as it was enacted, one school district's use of an Indigenous name, mascot, or logo would not constitute a violation of the regulation if the school district obtained a written agreement with a federally or state-recognized Native American tribe prior to May 3, 2023, while another school district's use of the exact same Indigenous name, mascot, or logo would be deemed a violation if they had no written agreement. It simply makes no sense how one school district's conduct could be characterized as a DASA violation while another school district's same conduct would not.

138.     Additionally, individual Native American tribes and individuals cannot be the sole decision-makers on whether a school district's use of an Indigenous name, logo or mascot is legal or not. They are not elected officials accountable to constituents, and therefore should not be the sole decision-maker as to whether a school district can continue to use their team name, mascot, or logo.

**J.   The NYSED's Treatment of School Districts With a Warriors Name Has Been Both Haphazard and Contradictory**

139.     Upon information and belief, the NYSED has allowed the Chenango Valley Central School District to keep its "Warriors" nickname because it was not connected with Indigenous

Nations or peoples.

140.    And yet Petitioners-Plaintiffs are unable to retire their Native American imagery and rebrand the "Warriors" name. As set forth above, warriors (and what they represent) are not specific to Native American culture but have connections to a range of different cultures spanning various time periods throughout history.

141.    If the Wyandanch UFSD and Wantagh UFSD retire their Native American imagery and successfully rebrand of the Warriors name, then there is no rational reason why they should not be able to continue to use the Warriors name. Even the Chairman of the Shinnecock Nation himself, someone who has been intimately involved the NYSED's implementation of Part 123, called it a "no-brainer."

142.    Upon information and belief, the Salamanca City Central School District has been exempted from Part 123 and allowed to maintain its Warriors name ***and logo*** which depicts a Native American male after reaching an agreement with the Seneca Nation.

143.    Upon information and belief, the Salamanaca City Central School District did not obtain approval from the Seneca Nation until after the May 3, 2023 deadline to do so.

144.    The Salamanca Board of Education issued a resolution on April 25, 2023 authorizing its superintendent to seek and approve permission from the Seneca Nation for the school district to continue to use its Native American imagery and identify as The Warriors.

145.    As reflected in the minutes for the Salamanca Board of Education's April 25 meeting, the school district held four community forums to get feedback from students, staff and residents about district's logo and identity. The district superintendent shared the findings of these community forums at the April 25 meeting; he indicated there was a significant amount of support for retaining the district's identity as the Warriors and for the continued use of the logo.

146.    On April 30, 2023, the New York Post reported that the Salamanca Board of Education authorized the superintendent to seek approval from the Seneca and that the Seneca Nation did not immediately issue a decision.[4]

147.    Fortune.com published a similar story, reporting that the Seneca Nation did not immediately issue a decision but Seneca Indian Nation's leader commented the nation would "carefully consider" the request.[5]

148.    On May 17 and May 18, 2023, several news sources reported that the Seneca Indian Nation gave approval on May 17, 2023 to allow the Salamanca city schools to continue to use its "Warriors" name and imagery.

149.    If the Salamanca city schools did not obtain written approval from the Seneca Nation until May 17, as reported, then it could not have complied with the NYSED's May 3, 2023 deadline to obtain an exemption.

150.    And yet it appears the Salamanca city schools exemption will be honored, while the Wyandanch UFSD's exemption request was rejected because it came eight days after the May 3 deadline.

151.    Under these circumstances, the NYSED's differential treatment of school districts in enforcing the May 3 deadline would be the epitome of arbitrary and capricious.

152.    Notwithstanding the May 3 deadline, there is no rational basis for allowing one school district to retain its Warriors name and Native American imagery while not permitting another district to use only a rebranded Warriors name.

---

[4] This April 30, 2023 New York Post article, entitled "Should school use 'Warrior' nick name? Tribe to have last say," is publicly available at https://nypost.com/2023/04/30/seneca-indian-nation-could-approve-salamanca-warriors-name/.

[5] This April 30, 2023 Fortune article, entitled "AN upstate New York school may keep its Native American logo and "Warriors" nickname—because the local Seneca tribe is proud of it," is publicly available at https://fortune.com/2023/04/30/high-school-native-american-logo-nickname-salamanca-new-york-seneca-tribe/.

153.    This differential treatment is particularly egregious with respect to Wyandanch who, like the Salamanca city schools, obtained approval from a federally recognized Long Island tribal nation.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS-RESPONDENTS

### (Violation of State Administrative Procedures Act)

154.    Plaintiffs-Petitioners repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

155.    Part 123 prohibits all public schools in the State of New York from utilizing or displaying an Indigenous name, logo, or mascot, with limited exceptions, and impose harsh penalties for schools that do not comply.

156.    Because Part 123 is a statewide prohibition, it constitutes a "rule" as defined in the SAPA. *See* N.Y. A.P.A. Law § 102(2)(a) (defining a "rule" as a statement of "general applicability that implements or applies law," or a statement of "the procedure or practice requirements of an agency").

157.    Under the SAPA and the New York Constitution, rule-making by an administrative agency must comply with certain procedural requirements, including notice-and-comment requirements. *See* N.Y. A.P.A. Law § 202(1) (outlining rulemaking procedure required by SAPA, which includes notice-and-comment requirements); *see also* N.Y. A.P.A. Law § 102(2)(a) (defining a "rule" as a statement of "general applicability that implements or applies law," or a statement of "the procedure or practice requirements of an agency").

158.    The notice-and-comment period for Part 123 was merely a pretense as the NYSED had already determined the outcome of the notice-and-comment period before it even began. Even more, the end result appears to have been fixed before Part 123 was even fully drafted.

159.     Defendants-Respondents also violated SAPA by expanding the scope of Part 123 after its enactment. In response to the utter confusion created by Part 123 inherent vagueness, the NYSED release an FAQ guide in May 2023. In that informational packet, the NYSED indicated that it would prohibit any name, logo, or mascot that bore any connection to Native American culture at any point in time, even if not currently. The NYSED advised school districts to consult historical documentation, such as year books, to determine if Part 123 applied to them.

160.     This was an expansion of the definition of "Indigenous name, logo, or mascot" as set forth in Part 123, which says no such thing. (8 NYCRR 123.1.)

161.     Defendants-Respondents cannot unilaterally expand the scope of its regulation after its enactment. In doing so, they have circumvented the requirements of SAPA.

162.     An Article 78 proceeding must be commenced within four months after the determination to be reviewed becomes final and binding upon the petitioner. This date is not necessarily the effective date of a challenged regulation, but rather when the challenged determination inflicts an actual, concrete injury upon the petitioner.

163.     Although Part 123 was enacted on April 17, 2023 and took effect on May 3, 2023, public school districts had until June 30, 2023 to first self-determine if their names, logos, or mascots even fall within the scope of Part 123, and if so, to commit, via resolution to eliminate such names, logos, and mascots by the end of the 2022-2023 school year.

164.     It was not until June 30, 2023, or alternatively the dates on which Plaintiffs-Petitioners passed resolutions in compliance with the June 30 deadline, that the challenged determination inflicted an actual, concrete injury upon Plaintiffs-Petitioners.

165.     Plaintiffs-Petitioners' Article 78 claims are therefore timely.

166.     Accordingly, Plaintiffs-Petitioners are entitled to a judgment pursuant to C.P.L.R.

§ 3001, declaring that Part 123 is contrary to law and thus null and void; and to a judgment, pursuant to C.P.L.R. § 7803(3), that Part 123 is contrary to law, arbitrary and capricious, and an abuse of discretion, and enjoining Defendants-Respondents form enforcing the New Regulations against them.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS-RESPONDENTS

### (Violation of State Administrative Procedures Act)

167.    Plaintiffs-Petitioners repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

168.    Administrative agencies, as creatures of the Legislature within the executive branch, may establish rules and regulations for the administration of statute to give effect to legislative policies, if authorized to do so.

169.    While an administrative agency can adopt rules and regulations for carrying out a law, it cannot create rules that were not contemplated or authorized by the Legislature. Specifically, an administrative agency's rule-making power does not authorize it to extend, limit, or alter the statute.

170.    Nor can an administrative agency exercise its rule-making authority to engage in broad-based public policy determinations.

171.    Defendants-Respondents exceeded the scope of their authority in enacting Part 123 because the regulation attempts to extend the reach of DASA.

172.    As reflected in the legislative history of DASA, and the statute itself, DASA was an anti-bullying legislation created mainly to create a safe school environment for students by preventing incidents of discrimination, harassment, and bullying. To serve this purpose, the Legislature implemented standardized policies for schools to prevent incidents of discrimination,

bullying, and harassment from occurring. The statute also standardized the process for investigating complaints of this nature, and provided schools with guidance regarding what action they should take after finding a DASA violation occurred.

173.     In enacting Part 123, the NYSED improperly relies on DASA to create a blanket prohibition on the use of any names, mascots, or logos that are loosely related to Native Americans. What is missing in Part 123, is a determination as to what certain names, mascots, or logos violate DASA.

174.     This type of broad-based public policy determination extends beyond the NYSED's rule-making authority.

175.     Defendants-Respondents also impermissibly infringe upon school districts' authority and discretion in how to conduct an interscholastic sports program, including determining the propriety of a sports team name, mascot, or logo.

176.     While such decisions can only be set aside upon a showing that a board of education abused its discretion, Defendants-Respondents significantly limited this discretionary authority without a providing a showing that the Board of Education has abused its discretion.

177.     Defendants-Respondents rely heavily on the Commissioner's determination in *Appeal of McMillan*, in which the Commissioner analyzed a school district's use of an "Indians" team name. While the Commissioner determined in *Appeal of McMillan* that the respondent school district abused its discretion by using an "Indians" team name and logo, Respondents-Defendants cannot bootstrap that decision to all team names, mascots, and logos used throughout the State.

178.     Accordingly, Plaintiffs-Petitioners are entitled to a judgment pursuant to C.P.L.R. § 3001, declaring that Part 123 is contrary to law and thus null and void; and to a judgment, pursuant to C.P.L.R. § 7803(3), that Part 123 is contrary to law, arbitrary and capricious, and an

abuse of discretion, and enjoining Defendants-Respondents form enforcing the New Regulations against them.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS-RESPONDENTS

**(Request for Declaratory Judgment that Part 123 Violates the Separation of Powers Clause of the United States Constitution and New York State Constitution)**

179.    Plaintiffs-Petitioners repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

180.    Commissioner regulations issued by the NYSED, including Part 123, have the force of law comparable to a statute.

181.    The United States Constitution establishes three separate but equal branches of government. The legislative branch makes the law, the executive branch enforces the law, and the judicial branch interprets the law. These separation of powers serve to provide for checks and balances in order to prevent any one branch from having too much power.

182.    The New York State Constitution similarly has a separation of powers clause meant to provide checks and balances at the state level. Article III, Section 13 of the New York State Constitution provides, "The enacting clause of all bills shall be 'The People of the State of New York, represented in Senate and Assembly, do enact as follows,' and no law shall be enacted except by bill."

183.    Part 123 was issued by the NYSED, an administrative agency within the executive branch. As an administrative agency, the NYSED can enforce the law, but it cannot create the law itself. That is a non-delegable duty bestowed upon the legislative branch.

184.    It follows that an administrative agency, like the NYSED, may adopt rules and regulations for carrying out a law, but cannot create rules that were not contemplated or authorized

by the Legislature.

185.    As set forth above, Defendants-Respondents exceeded the scope of their authority in enacting Part 123 because the regulation attempts to extend the reach of DASA and constitutes an impermissible broad-based policy determination.

186.    In doing so, Defendants-Respondents enacting a regulation that has been given the force of law without proper delegation from the State Legislature.

187.    Accordingly, the regulation is inherently unconstitutional as it was promulgated in violation of the separation of powers clause of the U.S. Constitution and NYS Constitution.

188.    Plaintiffs-Petitioners have no adequate remedy at law other than to seek declaratory relief.

189.    Plaintiffs-Petitioners are therefore entitled to an order invalidating Part 123 and declaring them null and void; a declaratory order; and an order permanently enjoining Part 123.

## AS AND FOR A FOURTH CAUSE OF ACTION THE INDIVIDUALLY-NAMED DEFENDANTS-RESPONDENTS

### (Part 123 Is Impermissibly Vague in Violation of the Fourteenth Amendment Due Process Clause of the U.S. Constitution)

190.    Plaintiffs-Petitioners repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

191.    A law violates the Fourteenth Amendment Due Process Clause if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what it prohibits. This is rooted in the well-settled constitutional principle that individuals should receive fair notice or warning when the state has prohibited specific behaviors or acts.

192.    A law is also unconstitutionally vague if it authorizes or even encourages arbitrary and discriminatory enforcement. A law is constitutionally vague where it fails to provide explicit

standards for those who apply them, and in doing so authorizes or encourages resolution on an *ad hoc* and subjective basis.

193.     The vagueness doctrine includes a "notice" component in that a statute must include language that conveys a sufficiently definite warning as to the proscribed conduct when measures by common understanding and practices. Where a statute fails to give adequate warning of the boundary between the constitutionally permissible and constitutionally impermissible applications of the statute, it does not satisfy the "notice" component and is therefore impermissibly vague.

194.     Part 123 is unconstitutionally vague in violation of the Fourteenth Amendment Due Process Clause of the United State Constitution to the extent that it fails to give adequate warning of the boundary between the constitutionally permissible and constitutionally impermissible applications of the statute. In other words, Part 123 is impermissibly vague because it fails to provide a reasonable opportunity to know what conduct is prohibited by law, leaving the public uncertain as to the conduct it prohibits.

195.     Part 123 does not adequately define what constitutes an Indigenous "name," "symbol," or "image."

196.     Part 123 also fails to describe the difference between a stereotypical aspect of Indigenous culture, as opposed to a representation that is accurate and respectful.

197.     As a result, persons of common intelligence must necessarily guess at the meaning, scope, and application of Part 123.

198.     Plaintiffs are entitled to a final judgment declaring that Part 123 is void for vagueness by failing to provide persons of ordinary intelligence a reasonable opportunity to understand the breadth of the law.

**AS AND FOR A FIFTH CAUSE OF ACTION ASSERTED BY PLAINTIFFS-PETITIONERS ANTHONY GRECO AND CHARLIE REED AGAINST THE INDIVIDUAL DEFENDANTS-RESPONDENTS**

**(Violation of First Amendment Right to Freedom of Speech)**

199.     Plaintiffs-Petitioners repeat and incorporate by reference the foregoing paragraphs as if fully stated herein.

200.     The First Amendment of the United States Constitution, through the Fourteenth Amendment, restricts the States from unlawfully compelling speech and impairing the right to free speech. Article 1, Section 8 of the New York State Constitution also protects the right to free speech. The First Amendment generally prevents governments from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Such content-based regulations are presumptively invalid.

201.     Additionally, contend-based restrictions on speech are subject to strict scrutiny standard. Under this exacting standard, governmental regulation of speech is enforceable only if it the least restrictive means for serving a compelling government interest.

202.     The protections of the First Amendment are not limited to spoken words, but rather include gestures and other expressive conduct, even if vulgar or offensive to some.

203.     To determine whether conduct is expressive and entitled to constitutional protection requires an inquiry into whether the activity is sufficiently imbued with the elements of communication to fall within the scope of the First and Fourteenth Amendments.

204.     To be sufficiently imbued with communicative elements, an activity need not necessarily embody a narrow, succinctly articulable message. So long as there is an intent to convey a particularized message along with a great likelihood that the message will be understood by those viewing it, expressive conduct will fall within the scope of the First Amendment.

205. The protection of the First Amendment depends not only on whether the conduct is expressive, but also on the context in which that expression takes place.

206. Part 123 prohibits school officers and employees from utilizing or promoting any Indigenous name, logo, or mascot, while on school property or at a school function. (8 NYCRR 123.5.) Because Part 123 is a content-based regulation, it is subject to strict scrutiny.

207. This enforcement provision of Part 123 unlawfully restricts individuals' free speech in violation of the First Amendment. Specifically, it prohibits District officials and employees, like Plaintiffs-Petitioners Anthony Greco and Charlie Reed, from engaging in expressive conduct through wearing Warriors apparel, regardless of whether they are acting as a citizen and a member of the public.

**Plaintiff-Petitioner Anthony Greco:**

208. Plaintiff-Petitioner Greco is not only a member of the Wantagh Board of Education. He has been a resident of the school community for 27 years. And in those 27 years, he has watched all six of his children graduate from Wantagh High School.

209. Plaintiff-Petitioner Greco's wife graduated from Wantagh High School, along with her eight siblings. Four of her siblings still reside in the District, along with their families.

210. Although his own children have graduated high school, Plaintiff-Petitioner Greco still regularly attends school games and functions to support his nieces, several of whom are still District students who play sports on District teams. He also attends games and functions to support the school community in general.

211. Plaintiff-Petitioner Greco regularly attends various sports games including football, volleyball, soccer, and lacrosse. He also attends homecoming and all championship games.

212. School sports are a popular pastime in Wantagh. Much of the community attends

school games while sporting their Warriors apparel.

213.    Warriors apparel also correlates with fundraising and awareness efforts. For example, members of the school community, including Plaintiff-Petitioner Greco, will wear specialty Warriors apparel in remembrance of 9/11. In fact, Plaintiff-Petitioner Greco just purchased a new Warriors hat in recognition of 9/11.

214.    Additionally, the Sports Booster Club, a parent-run organization, raises money through selling Warriors apparel to fund school sports teams throughout the year. The proceeds from the Sports Booster club also pay for sports scholarships and end-of-year student awards. Plaintiff-Petitioner Greco regularly attends these events throughout the school year.

215.    As a proud father, uncle, and community member, Plaintiff-Petitioner Greco has amassed quite the collection of Warriors gear over the years. He wears his Warriors apparel to sports games and other school functions to support not only student athletes, but the school community as a whole.

216.    Plaintiff-Petitioner Greco, along with his wife and relatives, wear their Warriors apparel while attending school games or other functions. When Plaintiff-Petitioner Greco sits in the stands with his wife to watch their family member's sports games, he is acting as a spectator, not a Board of Education Member.  And yet under Part 123, he is prohibited from wearing Warriors apparel while his wife and relatives can.

**Plaintiff-Petitioner Charlie Reed**

217.    Plaintiff-Petitioner Reed has been a Wyandanch resident since 1963, and he has been a Board of Education member for a total of 27 years. When he first moved to the area, the Warriors name was already in existence.

218.    In the years he has lived in the District, Plaintiff-Petitioner Reed has watched all

three of his children graduate from Wyandanch Memorial High School.

219.    Although his own children have graduated high school, Plaintiff-Petitioner Reed has two young grandchildren who are students in the District. As they grow older, he will continue participate in school events to support his grandkids, just as his did for his own children.

220.    Plaintiff-Petitioner Reed also attends school games, particularly football and basketball, to support the school community in general. He attends other school events as well, including but not limited to, high school band recitals and theatrical productions, etc.

221.    When Plaintiff-Petitioner Reed sits in the stands to watch sports games, he is acting as a spectator, not a Board of Education Member.  And yet under Part 123, he is prohibited from wearing Warriors apparel while other spectators can.

222.    This enforcement provision of Part 123 is unconstitutional because it cannot pass strict scrutiny.

223.    At a minimum, the enforcement provision of Part 123 is not narrowly tailored to serve a compelling interest because it restricts District officials and employees' free speech, like Plaintiff-Petitioner Greco and Charlie Reed, regardless of the context in which they are wearing their Warriors apparel.

224.    This is a content-based regulation that in no way satisfies strict scrutiny. Accordingly, Plaintiffs are entitled to a final judgment declaring that Part 123 violates Plaintiffs-Petitioners Greco and Charlie Reed's First Amendment right to engage in expressive conduct.


**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs-Petitioners respectfully request that the court enter a judgment:

225.    Declaring that Part 123 conflicts with governing law and is therefore null and void;

226.    Enjoining Defendants-Respondents from enforcing Part 123; and

227.    Awarding Plaintiffs-Petitioners such other and further relief as this Court may deem

just, equitable, and proper.

Dated: Carle Place, New York
        September 29, 2023                    SOKOLOFF STERN LLP
                                             *Attorneys for Plaintiffs-Petitioners*

                                        By: _____
                                             Adam I. Kleinberg
                                             Chelsea Weisbord
                                             179 Westbury Avenue
                                             Carle Place, New York 11514
                                             (516) 334-4500
                                             File No. 230101

## <u>VERIFICATION</u>

STATE OF NEW YORK    )
                           ) ss:
COUNTY OF NASSAU    )

      Adam Fisher, being duly sworn, deposes and says that he is the President of the Board of

Education of the Wantagh Union Free School District, which is a plaintiff-petitioner in the within

action; that he has read the foregoing Verified Complaint and Petition, and knows the contents

thereof; and based upon documents maintained within the entity's files, that the same is true to his

own knowledge, except as to the matters there in stated to be alleged upon information and belief,

and as to those matters deponent believes them to be true.

 

                                                Adam Fisher
                                                *(As President and on behalf of the*
                                                *Wantagh Board of Education*)

Subscribed and sworn to before me
this   **29**   day of September, 2023

 

<u>**NOTARY PUBLIC**</u>

                            JEANINE REALE
                   NOTARY PUBLIC, STATE OF NEW YORK
                        NO. 01RE6195844
                   QUALIFIED IN NASSAU COUNTY
              COMMISSION EXPIRES 11/3/24

## **VERIFICATION**

STATE OF NEW YORK     )
                                    ) ss:
COUNTY OF SUFFOLK   )

       Arlise Carson, being duly sworn, deposes and says that she is the Interim Superintendent

of Schools of the Wyandanch Union Free School District, plaintiff-petitioner in the within action;

that she has read the foregoing Verified Complaint and Petition, and knows the contents thereof;

and based upon documents maintained within the entity's files, that the same is true to his own

knowledge, except as to the matters there in stated to be alleged upon information and belief, and

as to those matters deponent believes them to be true.

*Arlise Carson*
Arlise Carson

Subscribed and sworn to before me
this _29th_ day of September, 2023

*Karen L. Parrish*
**NOTARY PUBLIC**

KAREN L. PARRISH
Notary Public, State of New York
NO. 01PA5065123
Qualified in Suffolk County
Commission Expires September 3, 20__26